D8g1paps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                12-CR-813 (PGG)

5   PAUL PAPPAS,

6             Defendant.         Sentencing

7   ------------------------------x

8                             New York, N.Y.
                             August 16, 2013
9                             10:18 a.m.

10

11  Before:

12               HON. PAUL G. GARDEPHE,

13                           District Judge

14                   APPEARANCES

15  PREET BHARARA
      United States Attorney for the
16      Southern District of New York
    RUSSELL CAPONE
17      Assistant United States Attorney

18  WILLKIE FARR & GALLAGHER, LLP
      Attorneys for Defendant
19  BY:  MARTIN KLOTZ, ESQ.
      MORGAN J. CLARK, ESQ.

20

21

22

23

24

25

D8g1paps

 1           (In open court; case called)

 2           THE CLERK:  Is the government ready?

 3           MR. CAPONE:  Yes.  Russell Capone for the government.

 4    Good morning, Judge.

 5           THE COURT:  Good morning.

 6           THE CLERK:  Defendant ready?

 7           MR. KLOTZ:  Yes, your Honor.  Martin Klotz and Morgan

 8    Clark for Mr. Pappas.

 9           THE COURT:  Good morning.

10           All right.  In preparation for sentencing, I have read

11    the presence report dated August 8th, I've read Mr. Klotz'

12    August 5th, 2013 sentencing submission and the exhibits to

13    that submission, including Dr. Drob's report and the letters

14    from Mr. Pappas' family and friends.  I've also read the

15    government's August 12th, 2013 submission.

16           Mr. Klotz, have you read the presence report and

17    its recommendation and discussed it with Mr. Pappas?

18           MR. KLOTZ:  Yes, your Honor.

19           THE COURT:  Mr. Pappas, have you read the presence

20    report and its recommendation and discussed it with Mr. Klotz?

21           THE DEFENDANT:  Yes, I have.

22           THE COURT:  Mr. Klotz, do you have any objections to

23    the factual portions of the presence report?

24           MR. KLOTZ:  I think we sent a few in and they were

25    included in the revised report, so nothing further, your Honor.

D8g1paps

1          THE COURT:  All right.  Mr. Capone, does the

2    government have any objections to the factual portions of the

3    presentence report?

4          MR. CAPONE:  No, your Honor.

5          THE COURT:  And I hereby adopt the findings of fact

6    set forth in the presentence report.

7          Although I'm not required to impose sentence in

8    accordance with the Sentencing Guidelines, I am required to

9    consider the recommended range under the guidelines.  Here, the

10   probation department applied the fraud guidelines and concluded

11   that Mr. Pappas' base offense level is 7.  The offense level

12   was increased by 12 levels because the loss resulting from his

13   conduct was between 200,000 and $400,000.  His offense level

14   was further increased by two levels because he wilfully

15   attempted to obstruct and impede the administration of justice

16   with respect to the investigation of the offense.  His offense

17   level was reduced by three levels for acceptance of

18   responsibility, resulting in a total offense level of 18.

19         The probation department determined that Mr. Pappas

20   has no criminal record.  Accordingly, he falls into criminal

21   history category I.

22         Offense level 18 at criminal history category I yields

23   a guidelines range of 27 to 33 months' imprisonment.

24         Mr. Klotz, does the defense have any objections to the

25   accuracy of the guidelines calculations in the presentence

D8g1paps

1   report?

2          MR. KLOTZ:  No, your Honor.

3          THE COURT:  Mr. Capone, does the government have any

4   objections to the calculations regarding the guidelines set

5   forth in the presentence report?

6          MR. CAPONE:  No, your Honor.

7          THE COURT:  And based upon my independent evaluation

8   of the Sentencing Guidelines, I accept the calculations set

9   forth in the presentence report.  Accordingly, I find that the

10  offense level is 18, the criminal history category is I, and

11  the recommended sentencing range is 27 to 33 months'

12  imprisonment.

13          I'll hear from you, Mr. Klotz, as to an appropriate

14  sentence.

15          MR. KLOTZ:  Thank you, your Honor.

16          Judge, the single largest issue for consideration at

17  sentencing is the state of Mr. Pappas' mental health and what

18  role that played in the offense and what role it ought to play

19  in a just and fair sentence to be imposed by your Honor today.

20          Nobody disputes that Mr. Pappas has very serious

21  mental health issues.  They go back a very long period of time.

22  They were exacerbated by a serious accident in the year 2000.

23  They've persisted since then.  He has, until incarceration, in

24  my judgment, never really been properly treated.  Part of that

25  is his own fault for not seeking appropriate treatment, but I

D8g1paps

think his mental state has been a contributing factor to the

conduct here, and the real issue, I don't think anybody

disputes that Mr. Pappas has very serious mental health issues.

The question is, what role did they play in explaining the

offense conduct and in potentially mitigating the sentence.

The government cites three -- I think three core facts

that, in the government's view, argue that the mental health

issues ought to be put to the side and not given any weight in

considering an appropriate sentence.

Factor -- the first factor is that the offense conduct

here required a great deal of planning and took place over an

extended period of time.  It wasn't an impulse offense.

The second factor is that the offense conduct involved

deceit and in particular the impersonation of other persons on

whose behalf Mr. Pappas claimed unemployment benefits.

And the third factor is that Mr. Pappas, knowing of

the investigation, obstructed justice.

And I'd like to address those three factors in turn

and explain why I think Mr. Pappas' mental health really is a

mitigating factor with respect to all of those.

First, with respect to the fact that the offense was

an elaborate offense and was carried out over a period of I

believe two years, this was not an offense like a series of

bank robberies.  Mr. Pappas had an elaborate, albeit in my view

misguided and, frankly, nutty view of the conduct in which he

D8g1paps

was engaged in which it was, while reprehensible in a moral

sense, technically legally permissible.  He talked himself into

an elaborate theory about he was entitled to put relatives on

the payroll even though they didn't do any work.

THE COURT:  Let me ask you this.  I had the sense that

these printing companies had been sold at this point.  Did he

still have a printing company or was this some other business?

MR. KLOTZ:  He had the printing companies which did

some consulting work in the printing business, as I understand

it.  He also had a number of real estate properties that

required management that I believe were done through the aegis

of the parent company.  So there was business activity.  It was

not totally a fictitious company.  And there were other

employees or persons affiliated with the companies.  This is

not to say that the relatives and friends on whose behalf he

claimed unemployment benefits did any genuine work or were paid

any money.  But Mr. Pappas really viewed himself as, to some

degree, akin to somebody who finds lawful ways of minimizing

their taxes and you might criticize them for, you know,

exploiting loopholes but in their mind they're legal loopholes.

We haven't offered this as a defense to the case.  You know,

Mr. Pappas knew that what he was doing was inappropriate, and

he certainly knew that he was under investigation and the

government viewed what he was doing as inappropriate.  But

interestingly enough, the government cites the fact that he

D8g1paps

1    knew he was under investigation and attempted to obstruct

2    justice, and I'll get to that in a minute, but he also talked

3    to the investigating agents and tried to persuade them that

4    what he was doing was lawful.  Unsuccessfully, of course,

5    because what he was doing was not lawful, but it's not -- it

6    really reflects in my mind some of the conclusions that

7    Dr. Drob came to in his report.  Mr. Pappas is an individual

8    who has delusions of grandiosity.  He thought he'd come up with

9    a really clever theory to outsmart the government.  He has a

10   hard time distinguishing between fantasy and reality.  He

11   doesn't appreciate the boundaries of socially appropriate

12   behavior.  And a lot of what was going on was this.  It doesn't

13   negate his guilt.  He's never, you know, asserted that this

14   negates his guilt.  But I think it's an important background

15   factor to be taken into consideration.

16            THE COURT:  From my review of the materials in the

17   case, it seems to me that Mr. Pappas has very substantial

18   assets, which raises the question of why it was that he was

19   engaged in a fraud that, while not insignificant in the amount

20   of money that was ultimately taken, doesn't seem that it would

21   be necessary for him to maintain his lifestyle.  So can you

22   speak to motive at all?

23            MR. KLOTZ:  I mean, I think, frankly, a lot of it has

24   to do with his view of himself as being really clever and came

25   up with a way of legally exploiting loopholes in the system and

D8g1paps

1   it was more for that than the actual income.  Although I would

2   also say, on the income side, standing alone, Mr. Pappas has

3   substantial assets, but they're not terribly liquid and his

4   cash flow is not terribly great, and as you know from the

5   presentence report, he's got very serious problems with some of

6   his children.  Those require expenses.  So I think there was an

7   economic motivation as well.  But I think the motivation was --

8   was split between the economic motivation and the motivation of

9   showing how smart he was and beating the government at

10  something that he viewed as an exploitable loophole in the law.

11          The second factor that the government points to is

12  Mr. Pappas' appropriation of other people's identities and

13  impersonation of several of the people on whose behalf he

14  claimed unemployment benefits.  Frankly, if you listen -- the

15  persons he impersonated were female in telephone calls to the

16  unemployment insurance people.  If you listen to the phone

17  calls -- and I think the investigation bears this out -- nobody

18  was fooled for two seconds that he was the person he was

19  pretending to be.  It was obviously somebody impersonating

20  somebody of a different gender.  And again, this wasn't so much

21  indicative of his incredible deceitfulness as a sort of

22  detachment from reality in thinking he could get away with this

23  sort of half funny conduct vis-à-vis some government officials

24  on the other end of the phone.

25          It is true that he misused other people's identities.

D8g1paps

1  The government concedes that in many instances that was with

2  their permission.  And I believe that all of the instances in

3  which it was not with their permission, it was relatives and he

4  sort of thought it was permissible.  So again, this is a little

5  bit different a category of an offense than somebody who steals

6  credit card information and, you know, runs around on a buying

7  spree completely misappropriating somebody else's identity.

8          And then the third factor that the government cites is

9  the obstruction of justice, and it's clear if you look through

10  exactly what it was that Mr. Pappas was advising the person on

11  whose behalf he fraudulently claimed unemployment benefits to

12  say, that you can't defend it as it was all legitimate, but

13  mostly what Mr. Pappas said to the individual was, get a lawyer

14  and don't talk to the investigators.  He shared with the

15  individual his misguided view that this investigation was

16  legally baseless and that what he in fact was doing was proper.

17  The advice that he gave to the person to talk about the

18  offense, not completely accurate.  He certainly didn't tell

19  them, tell the truth and don't hesitate to talk to them.  But

20  it tied into this fanciful theory that if you actually did a

21  certain amount of work and I could claim that it was really on

22  behalf of one of these companies and if you assume that I paid

23  you this amount of money, you know, then you would be entitled

24  to unemployment benefits, the individual in question did in

25  fact do some work for Mr. Pappas, was in fact paid some income.

D8g1paps

1   None of it justifies what happened, and we're not attempting to

2   claim that, but again, it's not a classic obstruction of

3   justice.  As the government emphasizes, Mr. Pappas knew he was

4   under investigation and was himself talking with the

5   investigators, trying to justify what he did.

6          So at the -- and all of this is against the background

7   of this is an individual who is clearly troubled and was not

8   getting the proper medication during the course of time when he

9   was engaged in this conduct.  As I said at the outset, I think

10  that's, in significant measure, his own fault.  He didn't seek

11  out the appropriate treatment for his mental health issues.

12  It's not like somebody else dropped the ball.  But the fact of

13  the matter is, his mental state was not the mental state of

14  somebody who deliberately goes out to violate the law and cheat

15  the government out of this money.  It doesn't rise to the level

16  of a legal defense, but it's a relevant factor to be

17  considered.

18         My submission is that at the end of the day, what

19  Mr. Pappas needs -- let me back up before I get to that.

20         When I first came to represent Mr. Pappas, he was in a

21  state where he was not properly medicated, and I can attest to

22  the fact that he was a very difficult client to deal with.  We

23  ultimately got him properly evaluated, partially from Dr. Drob,

24  partially from personnel at the MCC, got him properly

25  medicated, and it's been much easier, frankly, to represent him

D8g1paps

1    since that happened.  I think a large portion of what went on

2    here is untreated mental health issues.  And my submission is

3    that at the end of the day, what he really needs is mental

4    health treatment, which can be accomplished as a condition of

5    supervised release rather than further incarceration.

6         Now the second issue -- and it's not as important as

7    the mental health issue but it's also an important issue -- is

8    the family circumstances that Mr. Pappas finds himself in,

9    which, again, I think both go to what drove him to commit these

10   offenses.  He has very difficult family circumstances with two

11   children who have addiction issues and mental health issues of

12   their own, and I think coping with that situation has been very

13   difficult for him.  The government in its sentencing submission

14   says, well, that shouldn't be taken into consideration in

15   sentencing because those two children are adults, they don't

16   live at home.  The fact of the matter is, they are living at

17   home currently.  They've relapsed in their addiction problems

18   and they're living in the family residence.  Mr. Pappas' wife

19   is absolutely overwhelmed with trying to cope to -- with

20   household management, with the two kids who are difficult.

21   Mr. Pappas has been incarcerated for 14 months now, almost 14

22   months.  I think it was the beginning of July that he was first

23   arrested.  And, frankly, it would be of great assistance to the

24   family for him to be able to get back and help take care of

25   household matters.  Mrs. Pappas has healthcare issues of her

D8g1paps

1   own that she's postponed dealing with because she can't deal

2   with them while also managing the house and managing the two

3   kids who have problems, and Mr. Pappas' presence at home would

4   be of great assistance just in helping to do simple things like

5   pay the bills and get repairs done and buying groceries but

6   also to keep on top of the two kids who need -- I say kids,

7   they're adults, but they're his children, who really need

8   supervision of a sort to get to the treatment programs that

9   they need and to do the things that they need to do to

10  straighten out their lives.

11          I said it before, but the conclusion is this.  I think

12  this is not a case where anybody is served by further

13  incarceration.  What Mr. Pappas needs is mental health

14  services.  The probation department recommended that as a

15  condition of supervised release after his period of

16  incarceration.  My submission is, he's been in for 14 months

17  already, and really what he needs is the mental health services

18  as a condition of supervised release.  He's got a family that's

19  struggling.  It's a family that obviously has a lot of

20  problems, but I think the family will do better if Mr. Pappas

21  can be there to assist them than if he's incarcerated for

22  another period of time.

23          THE COURT:  I'd like you to address a comment that

24  Dr. Drob makes, which is troubling.  This is from his report.

25  "Mr. Pappas is transparently manipulative in his efforts to

D8g1paps

1    utilize and perhaps exaggerate his mood symptoms in an effort

2    to gain some real or imagined legal or financial advantage."

3    And then Dr. Drob goes on to comment that, "It is thus

4    difficult to ascertain his actual condition."

5         MR. KLOTZ:   Right.   I think that's an absolutely

6    accurate statement.   I've spoken to Dr. Drob at length in

7    addition to reading his report.   And I think what he would say,

8    because he said it to me, is that manipulative behavior is

9    itself very often a symptom of mental health issues.   A lot of

10   mentally ill people are also manipulative, and it doesn't mean

11   that they're not mentally ill.   It's in fact very often a

12   behavior set that exacerbates the problem, because their

13   manipulation, frankly, is very often transparent and just makes

14   people that they deal with even more frustrated in dealing with

15   them.   I think -- and I'll speak from personal experience.   I

16   think that's an accurate statement of the way Mr. Pappas

17   behaved prior to the time that he was more properly medicated

18   at the Metropolitan Correctional Center.   But I don't think

19   Dr. Drob and I don't think any of the other numerous mental

20   health professionals who have examined Mr. Pappas over the

21   years has the slightest doubt that he in fact suffers from

22   severe mental health issues.   I think -- and Dr. Drob, by the

23   way, was not the only person to make that observation.   I think

24   in the prior record -- but I'm not certain that it works its

25   way into the report -- one of the other doctors, maybe back ten

D8g1paps

1    years ago, made a similar observation.  But it wasn't to the

2    effect of:  Here is somebody who is faking mental illness.  It

3    was to the effect of:  Here's somebody who has very serious

4    problems but one of the symptoms of the problems is that

5    they're manipulative and not entirely honest about themselves

6    and that makes it even more difficult to understand exactly

7    what's going on.  So I don't want to discount the comment

8    because it is an important, you know, factor to take into

9    consideration, but I don't think it undercuts the conclusion

10   that he's an individual with mental health issues and that

11   those mental health issues -- I mean, the manipulativeness, you

12   can actually see in the offense conduct.  It's manipulating

13   relatives, manipulating friends, manipulating other people that

14   he knew to go along with the scheme.

15        THE COURT:  All right.  Mr. Pappas, is there anything

16   you wish to say before the court imposes sentence?

17        THE DEFENDANT:  Yes.  First of all, I'm very sorry for

18   what I've done, but I was under tremendous pressure based on

19   the fact that I have two children that are addicted to opiates

20   and it's a terrible situation to be under, having those two

21   kids.  And from the auto accident, it made me TBI and made my

22   bipolar disorder much more serious than it was, and for many

23   years I wasn't properly medicated and I was made manic, and

24   while I was manic, I committed this crime.  But now that I've

25   got the proper medication, I'm ready to become a productive

D8g1paps

member of society.  And I'm just asking for a second chance.
And I want to go back and help my family because once you
sentence me today, the $2200 a month that my family is getting
in disability income is going to be cut off and I'm not sure
how my family's going to survive, your Honor, so all I'm asking
is, the quicker I get back to my family, the quicker they're
going to get the support they need from my disability income so
things -- I'm just asking for another chance, your Honor, and I
really need my family to be able to survive.  They need me.
And thank you for your time.

THE COURT:  Mr. Capone, is there anything you wish to
say?

MR. CAPONE:  Your Honor, I'll be very brief, and
really, most of it is in my submission.

Obviously there's no dispute that Mr. Pappas does have
some mental health problems, and I understand that is part of
who he is, which is a relevant consideration that the court can
take into account.  But I still don't quite see how -- the
direct connection between the -- those issues and the crime
here.  The suggestion is that his mental state gave him these
delusions of grandiosity I think was the suggestion, made him
think he can pull one over the system and be particularly
manipulative, and I guess that's what Dr. Drob found as well,
that this is a manipulative person.  But maybe the defendant is
just manipulative.  I don't know that that's a mental health

D8g1paps

1    issue.  This is clearly a complex and lengthy crime, that

2    there's no suggestion that the defendant thought he was

3    entitled to that money.  He knew what he was doing, he knew he

4    was attempting to outsmart the government.  It involved a lot

5    of work.  And so I think for that reason, it was a serious

6    crime and the defendant -- this is a defendant who is certainly

7    in need of deterrence I think in light of the overall picture

8    here, of the complexity of the crime, his efforts to attempt

9    to -- not to be arrested or not to be charged when he figured

10   out that the government was on to him.  I don't think -- I do

11   think it's classic obstruction.  The defendant sat down with a

12   witness and told him to lie to the government and came up with

13   a story that the witness should give about work that never

14   happened, and payments that he said were genuine that were not

15   genuine.  The defendant did talk to investigators, but it's not

16   as if that conversation itself was full of truths.  The

17   defendant drove another witness -- when another witness went in

18   to speak with investigators before the defendant was charged,

19   the defendant was outside waiting in his car.  He was the one

20   who drove her there.  He was keeping close tabs on the

21   investigation and doing everything he could to make sure it

22   didn't result in his arrest; again, further indicia of

23   manipulativeness and somebody who's in substantial need of

24   deterrence.

25            So for all of those reasons and as set forth in our

D8g1paps

1    submission, the government thinks that a guidelines sentence is

2    appropriate.

3          THE COURT:  All right.  In deciding upon an

4    appropriate sentence, I have considered all the factors listed

5    in Title 18 United States Code Section 3553(a), including the

6    nature and circumstances of Mr. Pappas' offense, his personal

7    history and characteristics, the need for the sentence imposed

8    to reflect the seriousness of the offense, to promote respect

9    for the law, to provide just punishment, and to afford adequate

10   deterrence.

11         Beginning with the nature and circumstances of the

12   offense, the charge against Mr. Pappas stems from an

13   investigation by the Department of Labor which uncovered his

14   scheme to defraud the New York State Unemployment Insurance

15   Fund.  From about July 2011 to about August 2012, Mr. Pappas

16   pretended to employ members of his family and others at two

17   companies that he controlled.  He created fake payroll records

18   for these fake employees, indicating that they were paid

19   exactly the minimum amount necessary to qualify for

20   unemployment benefits.  Mr. Pappas then pretended to be those

21   employees and filed for unemployment benefits under their names

22   after they had ostensibly been fired.  After the fake employees

23   qualified for unemployment benefits, Mr. Pappas arranged for

24   those benefits to be paid into bank accounts that he

25   controlled.

D8g1paps

1          In perpetrating the scheme, Mr. Pappas made telephone

2     calls to the Unemployment Insurance Fund pretending to be the

3     fake employees, including, as Mr. Klotz said, female employees,

4     and he used their personal information on at least some

5     occasions without their permission or knowledge.  Through this

6     scheme Mr. Pappas defrauded the New York State Unemployment

7     Insurance Fund of approximately $200,000.

8          Sometime in early 2012, Mr. Pappas learned that he was

9     under investigation.  He did not stop his fraudulent behavior.

10    However, instead he instructed one of the fake employees to lie

11    to the authorities and say that he had worked for Mr. Pappas.

12         Back on April 15th, Mr. Pappas pleaded guilty to a

13    superseding information charging him with one count of wire

14    fraud.

15         Now let me say that with respect to the crime, it

16    clearly involved a lot of thought and there were a lot of balls

17    to keep up in the air because he was making multiple

18    applications on behalf of multiple people, and then had to

19    contact the fund on behalf of them on something like a weekly

20    basis to maintain their eligibility.  So there were a lot of

21    moving parts here.  But having said that, there is a whacky

22    aspect to this, and when I say whacky, I mean, for example,

23    calling the unemployment people and pretending to be a woman.

24    It's indicative of someone who's not entirely stable.

25         With respect to Mr. Pappas' personal history, he's 54.

D8g1paps

He was raised in Jamaica, Queens.  His father left the family when he was 14, and he essentially became the head of the household.  He has two siblings, one of whom is mentally disabled.  Mr. Pappas is married and has three children in their 20s, two of whom are addicted to heroin and have been in and out of residential drug treatment programs.  The other child is in college.

Mr. Pappas' wife is employed at a bank but suffers from a blood condition and has reportedly had difficulty managing her illness as well as the problems of her family while Mr. Pappas has been detained.  And as Mr. Klotz indicated, he has been detained since July 1st of last year.

Mr. Pappas is an intelligent man.  He has a bachelor's degree from St. John's University.  He began working in the printing industry in 1982, started his own printing business in 1985, and between 1985 and 2001 owned a series of highly successful commercial printing businesses, which were quite lucrative.  He has substantial assets, including several homes, although he has put these assets under the name of an entity called Pappas Family Limited Partnership.  Mr. Pappas has no criminal record.  He was diagnosed with ADHD as a child but appears to have performed at a very high level until about 2000, when he suffered a car accident, which has been alluded to this morning.  The airbag in the car inflated, and some physicians believe that Mr. Pappas suffered a traumatic brain

D8g1paps

1    injury at that time.  Certainly in the years after the

2    accident, a number of doctors have diagnosed Mr. Pappas with

3    suffering from significant mental illnesses, including bipolar

4    disorder, schizophrenia, posttraumatic stress disorder, and

5    depression, and since 2002 he has taken a wide variety of

6    psychiatric medications for these conditions.

7              Mr. Pappas has other medical conditions, including

8    hearing loss, speech problems, and pain in his right leg caused

9    by the car accident.  It has been difficult to ascertain the

10   precise nature of the defendant's mental condition and, as

11   Mr. Klotz said this morning, what connection, if any, exists

12   between his mental condition and his criminal conduct is the

13   key inquiry from my perspective.

14              I conclude that this is one of those cases in which

15   Mr. Pappas' mental condition does not provide him with a legal

16   defense but nonetheless is relevant in terms of determining his

17   culpability.  I have alluded to a forensic psychological

18   examination that was conducted by Dr. Sanford Drob of

19   Mr. Pappas in November and December 2012, and I have studied

20   that report.  Dr. Drob found Mr. Pappas to be highly

21   intelligent.  He further concluded that nothing in prior

22   testing, or in the tests that he himself performed, indicates

23   that the defendant suffers from a severe neuropsychological

24   disorder, and as I quoted a moment ago, Dr. Drob made reference

25   to the fact that Mr. Pappas has a tendency to be "transparently

D8g1paps

manipulative and may exaggerate his symptoms in an effort to
gain some type of advantage."  And Dr. Drob did comment that in
light of this characteristic, it is "difficult to ascertain his
actual condition."  Having said that, Dr. Drob concluded that
Mr. Pappas suffers from a "clinically significant psychological
disorder, characterized by depression, irritability, and mood
swings."  And I might say that Dr. Drob's findings in this
regard are consistent with more than ten years of psychological
and psychiatric examinations that have been conducted of
Mr. Pappas and consistent with the fact that he's been
prescribed a wide variety of serious psychiatric medications,
indicating that many other doctors before Dr. Drob had
concluded that Mr. Pappas suffers from serious psychological
disorders.

        Now while I have concluded that Mr. Pappas' mental
state did not prevent him from being fully aware during the
time that he was defrauding the unemployment insurance fund
that what he was doing was wrong and illegal, I further
conclude that his mental condition is relevant to an
appropriate sentence.

        The guidelines recommend a sentence of between 27 and
33 months.  Probation department has recommended a sentence of
27 months.  The defendant seeks a sentence of time served.  And
as I've indicated, he has been detained since July, early July
2012, and thus is approaching 14 months' incarceration.  The

D8g1paps

1    government seeks a guidelines sentence.

2              With all of this in mind, I will now describe the

3    sentence I intend to impose and then I'll ask the parties if

4    there's anything further they wish to say.

5              With respect to imprisonment, I intend to impose a

6    sentence of time served.  I conclude that the amount of

7    incarceration that the defendant has already served has

8    provided a sufficient deterrence to him with respect to future

9    criminal conduct, and in light of his mental condition, I do

10   tend to agree with Mr. Klotz that what he needs most at this

11   point is intensive psychiatric treatment.

12             With respect to supervised release, I intend to impose

13   a sentence of three years.  Supervised release will be served

14   on the following conditions:

15             The defendant shall not commit another federal, state,

16   or local crime; he shall not illegally possess a controlled

17   substance; he shall not possess a firearm or destructive

18   device; he shall cooperate in the collection of DNA as directed

19   by the probation officer; he shall refrain from any unlawful

20   use of a controlled substance; he shall submit to one drug

21   testing within 15 days of placement on supervised release and

22   at least two unscheduled drug tests thereafter, as directed by

23   the probation officer.

24             I intend to impose the first 13 standard conditions of

25   supervised release, along with the following special

D8g1paps

1    conditions:

2           The defendant shall provide the probation office with

3    access to any requested financial information; the defendant

4    shall not open any additional lines of credit without the

5    approval of the probation officer; the defendant shall

6    participate in a mental health program approved by the US

7    Probation Office; he shall continue to take any prescribed

8    medications unless otherwise instructed by the healthcare

9    provider; I authorize the release of available psychological

10   and psychiatric evaluations and reports to the healthcare

11   provider as approved by the probation office.  The defendant

12   shall contribute to the cost of services rendered not covered

13   by third-party payment.

14          The defendant is to report to the nearest probation

15   office within 72 hours of release from custody.

16          The guidelines recommend a fine of between $6,000 and

17   $60,000.  The defendant has substantial assets.  I intend to

18   impose a $6,000 fine.

19          I intend to impose a $100 special assessment.

20          As to restitution, I intend to order that the

21   defendant make restitution to the New York State Unemployment

22   Insurance Fund in the amount of $192,601.

23          I also intend to execute the consent preliminary order

24   of forfeiture which has been handed up this morning.

25          Mr. Klotz, anything further you wish to say?

D8g1paps

1          MR. KLOTZ:  No, your Honor.

2          THE COURT:  Mr. Pappas, anything further you wish to

3     say?

4          THE DEFENDANT:  No, your Honor.

5          THE COURT:  Mr. Capone, anything else from the

6     government?

7          MR. CAPONE:  No, your Honor.

8          THE COURT:  Now, Mr. Pappas, for the reasons I just

9     stated, it is the judgment of this court that you be sentenced

10    to time served and three years of supervised release.

11         Your supervised release will be subject to the

12    mandatory, standard, and special conditions I just listed.

13         You are ordered to pay a fine of $6,000, which will be

14    due immediately, and a special assessment in the amount of

15    $100.

16         You are ordered to pay restitution in the amount of

17    $192,601 to the New York State Unemployment Insurance Fund.

18    Payments are to be made to the Clerk, United States District

19    Court, 500 Pearl Street, New York, New York, 10007, for

20    disbursement to the New York State Unemployment Insurance Fund.

21    Restitution is to be paid in full by August 14th, 2014.

22         Are there any open counts, Mr. Capone?

23         MR. CAPONE:  Your Honor, there is an underlying

24    indictment, and the government would move to dismiss that.

25         THE COURT:  All right.  That motion is granted.

D8g1paps

1          Mr. Pappas, I'm required to advise you of your appeal

2     rights.  You can appeal your conviction if you believe that

3     your guilty plea was unlawful or involuntary or if there was

4     some other fundamental defect in the proceedings that was not

5     waived by your guilty plea.  You also have a statutory right to

6     appeal your sentence under certain circumstances.  With few

7     exceptions, any notice of appeal must be filed within 14 days

8     of judgment being entered in your case.  Judgment will likely

9     be entered today.  Mr. Klotz will discuss with you whether or

10    not you wish to file a notice of appeal.  If you're not able to

11    pay the cost of an appeal, you pay apply for leave to appeal *in*

12    *forma pauperis*.  If you request, the clerk of the court will

13    prepare and file a notice of appeal on your behalf.

14          Defense counsel has requested that his sentencing

15    submission be sealed because it discusses the defendant and his

16    family's medical condition.  That application is granted.

17          Is there anything further?

18          MR. CAPONE:  No, your Honor.  The government's

19    submission I guess will -- I also filed that under seal, so it

20    should remain under seal as well.

21          THE COURT:  All right.  Then it will remain under

22    seal.

23          MR. CAPONE:  Thank you, your Honor.

24          MR. KLOTZ:  Nothing further, your Honor.

25                          o0o